[Crim. No. 2933.    Third Dist.    Feb. 25, 1960.]

THE PEOPLE, Respondent, v. HENRY BENJAMIN WILLIAMS et al., Appellants.

Henry Benjamin Williams in pro. per., and Irvine P. Dungan, under appointment by the District Court of Appeal, for Appellants.

Stanley Mosk, Attorney General, and G. A. Strader, Deputy Attorney General, for Respondent.

VAN DYKE, P. J.—These are appeals from judgments entered upon jury verdicts which found appellants guilty of burglary in the second degree and of grand theft. Appellant Williams has filed no brief. Although both Rushing and Krolikowski applied for and received the assistance of court-appointed counsel, Williams requested no assistance and has not responded to notice that his appeal would be dismissed unless his brief was filed. His appeal must be dismissed.

Counsel for Rushing and Krolikowski do not challenge the sufficiency of the evidence to support the verdicts. As to both appellants it is contended that the jury was prejudicially influenced against appellants by the trial court, and that the court erred in admitting evidence of another crime. It is further contended as to appellant Rushing that his cause was prejudiced by misconduct of the district attorney.

The first alleged instance of judicial misconduct occurred in the examination of a witness, George Grundy, who testified for the prosecution, and who admittedly had received immunity. His testimony showed that he was criminally involved in the theft of tractor parts from Sierra Tractor and Equipment Company in Redding, whose premises had been burglarized. After Grundy's examination in chief, and after his cross-examination had been completed, he was reexamined on direct. On recross he was asked if he had ever been convicted of a felony. The court stated that it would make an objection that the impeaching question was not recross examination and would make the objection even if the district attorney did not. The district attorney stated that he desired the witness be allowed to answer the question. The witness then said that he had never been convicted of a felony "that I know of." The court then asked him if he had ever been sent to prison and the witness answered he had not. Since the witness substantially answered the impeaching question no prejudice could have resulted from the court's statement.

The next incident refers to a time toward the close of the case when the court excused the jury and stated to counsel that some of the jurors had asked him some questions

about evidence and he wanted to inform counsel about the matter; that one juror wanted to know what appellant Rushing had said about being ordered to go to Weaverville to pay a $250 fine and who had ordered him to go; that another question asked was what Rushing's testimony had been concerning a period of time he spent in Sacramento, the reference being to something Rushing had said about phoning his home although he didn't go there; that other jurors had asked the whereabouts of one Jenecke, a man who had been referred to frequently in the testimony, and whether or not he was going to be a witness. The court asked counsel if there was any question concerning these matters and sug-· gested that if so the doubt should be cleared up. A discussion then occurred between the court and counsel as to what might be done to clear up the uncertainties in the minds of the jurors. Concerning these matters appellants assert that there was thus disclosed an opportunity for the court to have influenced the jury outside the courtroom. Nothing that occurred would suggest that the court took the opportunity to say anything that might influence the jury one way or another and it appears from the record that trial counsel for appellants were not disturbed. The incident does not appear to have been mentioned during new trial proceedings which were taken by all of the defendants. We cannot assume from what transpired that there was any misconduct whatever.

█ Finally, appellants argue that the court acted unfairly in discussing the forms of verdict with the jury. The court first read to the jury a form of verdict to be used to declare guilt, saying, as to the opposite form of verdict, that it was the same as the first save that the word "not" appeared in front of the word "guilty." We find no merit in this contention. A similar one was made and ruled against in *People* v. *Hayes,* 161 Cal.App.2d 129 [326 P.2d 169]. It is presumed and ought to be presumed that members of a jury were possessed of intelligence and would not conclude from what was said that the court was suggesting they ought to bring in a guilty verdict.

█ It is urged that the trial court erred in admitting evidence of a different crime than that for which appellants were being prosecuted. Appellants were convicted of having entered the premises of the Sierra Tractor and Equipment Company in Redding, California, during the early morning hours of January 28, 1958, and of having stolen tractor parts.

The evidence that these crimes were committed was direct and complete, but the evidence that it was the appellants who had committed the crimes was entirely circumstantial. One Bridges, who had been active in the disposal of the property taken, and who thereafter had suffered an accident of such nature that at the time of the trial he was awaiting medical and surgical treatment, was called as a witness by the prosecution at the beginning of the trial somewhat out of order because of his having to report for treatment. He related that on the day after the burglary in Redding the three defendants and Grundy were all in Shafter, a small town in the southern part of the San Joaquin Valley, and had negotiated with him for a sale of tractor parts, which had been transported there in pickup trucks driven by defendants; that Grundy first came to him and suggested that Bridges buy; that Bridges refused because of a dislike for Rushing. Bridges went on to describe the correlated activities of the group, including arrangements made by him with his son-in-law for storing some of the parts. From his testimony and other testimony it appeared that Grundy took some of the parts to Saratoga, in the Santa Clara Valley, and sold them. Bridges related that on the 29th of January, in the morning, Grundy returned from Saratoga and he and Bridges and the three defendants were together again; that he saw them again on the 30th of January; that Grundy was there and gave them money; that Rushing left on the evening of the 30th; that on the 31st he, Bridges, went to the home of his son-in-law because Grundy had called him and said that ''they got picked up with those rollers'' and that he, Bridges, ought to get the ''stuff out''; that he had taken all of the parts that were at his son-in-law's home and laid them on a ditch bank on the Taft-Maricopa highway around 30 miles from Shafter. Up to this point Bridges had not mentioned the subject of tractor parts taken, as was later developed, from an equipment place in Bakersfield during the night of January 30th. He testified that after Grundy returned from Saratoga he had given him blank checks; that he did not know what parts were involved or what parts Grundy was going to buy with the checks and he further said that the checks had been given Grundy ''after the parts deal'' and that they were given on the ''roller deal, not on the parts.'' When asked if he did not consider that rollers were also parts, he replied, ''Well, they wasn't parts that came from Sierra Tractor.'' He said the checks had been given for parts different from those that came from Sierra Tractor and that the

Sierra Tractor parts had nothing to do with the checks given by him to Grundy. Counsel for defendant Williams who was cross-examining moved that all Bridges' testimony relating to anything not included in the Sierra Tractor burglary be stricken, including testimony about some checks he gave Grundy. The witness then volunteered the statement: "He [referring to defense counsel] is the one bringing it up, not me." In opposing the motion the prosecutor called the court's attention to his having put Bridges on before his testimony would naturally have come in in chronological order. After some argument on the motion, the court asked the witness if, when he gave Grundy the checks, he knew anything about the Sierra Tractor matter and the witness said he had known about it. The court refused to strike the testimony at that time. Continuing on cross-examination, Bridges testified that he gave Grundy checks for the purchase of parts; that they had nothing to do with the Sierra Tractor case; that although he knew about the parts the defendants had, he didn't know where they came from; that though he had refused to buy parts through or from Grundy on January 28th that later when Grundy said he needed some money and asked him to buy rollers he gave the checks. He said he didn't see the defendants after January 30th around 8 p.m., and he last saw Rushing on the 29th; that Rushing wasn't at Shafter on the 30th. Up to this point, Mr. Packard, counsel for Williams, had been cross-examining. He closed his cross-examination and Mr. Cibula, counsel for Rushing, took over. He asked Bridges if he knew how many tractor rollers he was to receive from the two checks he gave Grundy and Bridges replied that offhand he did not and then said: "Now, wait a minute, do you want to talk to—which case? The Sierra or Bakersfield?" The following then occurred: "Q. But there is a Bakersfield case, isn't there? A. That is right. That is the one you are speaking of now. Q. And the Bakersfield case is one in which there were quite a number of rollers involved? A. That is right. Q. There were at least thirty rollers involved in that case? A. That is what there was supposed to have been. Q. That was a burglary that took place down in Bakersfield? A. That is right. Q. It took place about the time that you and Mr. Grundy were dealing on these rollers—when you gave the blank checks, is that correct? A. It happened before I gave him the check. Q. The burglary at Bakersfield happened before you gave him the checks? A. That is right. Q. And you gave the checks for rollers that were involved in the

Bakersfield burglary? A. Well, whatever it was. Q. All right. And what took place just—do you know whether it was the 29th that that burglary took place, or the 27th or the 26th? A. It must have been—it must have happened on the 30th. The night of the 30th, some time or other. Q. Why do you say it must have happened on the 30th? A. Well, George [Grundy] got back to the motel on the 30th [from Saratoga], and they came to the room that night some time. 1:00 or 2:00 o'clock. Q. Well, who came to the room? The Bakersfield police? A. Mr. Williams and Mr. Krolikowski. Q. Oh. Is that why you say it must have taken place on the 30th? A. It had to be on the night of the 30th. Q. I see. And how many rollers were involved in that burglary? A. That is the one you are just speaking of. You said thirty. I don't know. Supposed to have been thirty. That is what you said. Q. Well, I am asking you how many rollers? A. I wasn't there. I don't know. Q. You gave a blank check to Mr. Grundy for rollers? A. That is right. Q. Did Mr. Grundy tell you where he was going to get these rollers? A. They were there with him. Q. Did Mr. Grundy tell you where he was going to get the rollers? A. That is right, from Mr. Williams and Mr. Krolikowski. Q. That is what Mr. Grundy told you? A. That is right. Q. And you were arrested in Bakersfield and investigated with respect to that burglary? A. Just asked me some questions. I wasn't arrested. Q. That is the Bakersfield police? A. Well, the Sheriff investigated me and asked me the questions. Q. The Sheriff from Bakersfield? A. No, from here. Mr. Johnson was with them. Q. Wasn't there an investigation down in Bakersfield, too? A. The only thing, they just asked me the questions, which I gave them.'' The subject was gone into further during Mr. Cibula's cross-examination of Bridges, but it is unnecessary to give further extracts from the record, for, from what has been related, it appears that the first definite disclosure in this trial that there had been a burglary of tractor parts at an equipment place in Bakersfield was brought out on the cross-examination of Bridges who, on direct, had not stated anything from which it could be reasonably inferred that these defendants had within three days after the Redding burglary engaged in burglarious activity in Bakersfield. It was Mr. Rushing's counsel who first fully developed the matter of the Bakersfield crimes. When Mr. Cibula closed his cross-examination, Mr. Goodrich, counsel for Krolikowski, cross-examined. The following occurred: ''Q. At the time you gave these checks to Mr. Grundy for the

parts you were buying, did you know of the burglary in Bakersfield? A. No.''

As the case continued there were more and more references from one side or another concerning the burglary and theft in Bakersfield more or less incidental to examination and cross-examination of witnesses testifying to the disposition of the tractor parts taken at Redding, which apparently became mixed with those taken at Bakersfield. When objections were next made to proof of the Bakersfield crimes, one White, a witness for the People, who was a deputy sheriff of Sacramento County, was on the stand under direct examination. He testified that he had been called by a Mr. Bottimore, a resident of Sacramento County, to whom Krolikowski had offered to sell tractor parts. Bottimore indicated he was suspicious about the transaction and White went to Bottimore's farm, to which Krolikowski had said he would return after obtaining a bill of sale to exhibit as proof of his title to the parts being offered. White testified that he met Krolikowski at Bottimore's and talked to him, asked him for his driver's license, read a bill of sale which he presented, and asked him to go to the Sacramento Sheriff's office so that he could check the transaction as to its legality; that Krolikowski agreed and started following him in Krolikowski's pickup car, but on the way stopped his pickup, got out and fled. White said he found 30 rollers, among other parts, in the pickup and had stored them in Galt, where they remained until the 17th day of February when they were picked up and shipped back. At this point Mr. Packard, counsel for Williams, objected to evidence being brought in relating to other crimes than those committed against the Sierra Tractor Company. Counsel for the other defendants joined in the objection, but the evidence was admitted over objection upon the ground that the two transactions were tied together, that the Bakersfield crimes showed common plan and design and criminal intent. Later the prosecution produced and there was received the testimony of a peace officer, and of the manager of the Bakersfield concern that had been burglarized, and the Bakersfield crimes were proved over renewed objections.

We do not think that the proof of the Bakersfield crimes was admissible under any of the exceptions to the general rule that evidence of other crimes may not be used to prove guilt of the charge being tried. Neither do we think that the error in receiving the evidence would justify a reversal. By the time that the direct proof that crimes had been committed in

Bakersfield was introduced the jury must have been so impressed by the indirect evidence thereof that had come in as to leave no doubt in their minds that these crimes had been committed, and from the circumstances that had been narrated that Williams and Krolikowski had probably committed them. Under all the circumstances no miscarriage of justice arose. As to appellant Rushing it was made clear that he had nothing to do with the Bakersfield transaction, and the jury were instructed that they could not consider the evidence of the Bakersfield crimes as against him.

Appellant Rushing contends that he was prejudiced by certain misconduct of the district attorney. He refers to cross-examination by that official which brought out that he had been "booked" on February 1, 1958, four days after the robbery and charged with concealing a .45 automatic and a shotgun. It appears that appellant Rushing was being questioned on direct examination in his own behalf as to various contacts with officers after the date of the Redding crimes and at a time when he had returned to Redding from Shafter. During that direct examination and in answer to a question as to how long he had been interrogated on the 1st of February, he answered: "They picked me up about 4:30 or 5:00 in the evening, and I was finally . . . booked . . . late in the night." He did not state what he had been booked for. On cross-examination he was asked questions about having been requested to sign a prepared statement concerning which he had testified on direct. He was asked if he had not said to the officers interrogating him that he did not know anyone in Redding, and he denied this. The following occurred: "Q. . . . Could you have possibly said it? A. I don't see why I would, because I know a few people in Redding. Q. You talked about—— A. (Interposing) If you [referring to the prosecutor] will remember the first time that I was up here, then answer some of those questions. Tell the jury what you said to me, and that will explain why I wouldn't give the Sheriff's Office any statements the second time I was picked up. Q. Mr. Rushing, you stated you were booked here on February 1st, is that correct? A. I said I was up here, yes. Q. Well, what were you booked on, what charge? A. I was booked on a concealed weapon." Since the first reference to a booking was on direct examination, since the reference thereto on cross-examination was in the form of a voluntary statement while being questioned we can find no misconduct in the district attorney having ascertained what crime Rushing was

booked for on that occasion. In addition to the foregoing there was no objection, which indicates that Mr. Rushing's attorney did not consider the incident to be of any consequence. There is no merit in this contention.

The appeal of Williams is dismissed. The judgments against Rushing and Krolikowski are affirmed as are the orders denying new trials.

Peek, J., and Schottky, J., concurred.